Case number 233290 Travis Carr v. FCA US LLC Arguments not to exceed 15 minutes per side. Mr. Dubow, you may proceed for the appellant. Thank you, Your Honors, and may it please the Court, my name is Attorney Daniel Dubow. I represent the appellant, Travis Carr. I'd like to reserve five minutes for rebuttal. Yes. Although Carr has presented multiple issues on appeal, there's really two threshold questions. And that's first, did the district court err in ruling that FCA did not have knowledge of his medical condition to perceive him as disabled? And two, whether the trial court erred in ruling that they did not have knowledge of his protected activity under the FMLA leave. So to the perceived disability claim, initially the district court ruled that FCA did have knowledge of the perceived disability. They had knowledge of his anger management issues, his flare-ups, and had confirmation of all of this from medical providers as well. And what happened is the district court permitted FCA to file... I think the timing matters. Do you agree that having anger and stress issues standing alone would not be a mental impairment? If it's not standing, and you see a lot of this type of thing come up again and again, then I think that would lead to someone believing that someone is mentally impaired. So for perceived disability, we just have to show that they believed him as mentally impaired. But you have to believe that they have what would be an actual disability, right? I have to believe that you're disabled, not that you just have anger issues. I have to believe that you have a long-standing inability to cope with stress or something. Let's assume that's a mental impairment. I'm not even sure that's true, but let's say it is. In May, right after the incident, when he's being investigated, is there enough information when the initial recommendation to terminate is made? How much is available at that point to suggest that somebody could believe that he was disabled? At that point, they're aware that he had these anger flare-ups and these anger issues throughout his employment. So they already had that in front of them. And then during the investigation where they interviewed our client, they then became aware that he was suffering from severe stress and anxiety, and he then made a request, I need to go out on this stress leave. So this is when Ruben talks to him during the investigation. And he says, hey, I have a stressful job, obviously. I'm thinking about taking some time off, whatever it is. And then she interviews other people. She writes up the report and says, termination. How is it that what he said to her then, I mean, that doesn't seem to me to be enough. And you're saying it's enough when, did Ruben know about other issues? Is that? Right, Ruben had access to his whole file. So she would have access to all the information about him as to other issues he had in the past, his known anger flare-ups. And then not only is he saying, I need to leave, like I need a stress leave because of my stress and anxiety, he then goes out and uses leave. So he doesn't return to work at that point. He then immediately requests and obtains a disability leave. But what I guess what I'm wondering is the timing. So there's been some debate about whether Ruben is the decision-maker or not. Assuming that she is the decision-maker and she decides in May that you've got to be terminated, everything that he does that summer doesn't bear on what she knew at the time that she recommends the termination decision, does it? It does also because at any point he could be offered anger management or EAP services and be returned to work. So there's testimony and evidence from other comparators that you can be offered EAP or anger management to lower the discipline or to be returned to work. And yet they never offer that to him while he's on this leave. So they could have done that at any point after when he goes out on leave. And they could have brought him back. And they chose never to do that. But we gave a list of numerous employees who engaged in far more severe conduct, which included actual physical touching for two of them. There was one who physically pushed an employee, used racist language. Another one who engaged in fist-fighting. Those people were offered anger management to return to work, but our client was not. And so our contention here is that they're not offering it to him because he's seen as too disabled that anger management isn't going to help him to come back to work. Part of the knowledge factor is this July call that Ruben had with Sedgwick about the nature of his leave. Is that right? And what's in the record is her notes? Correct, yes. So she had conversations with Sedgwick. They're the third-party entity that manages the benefits for the individuals at FCA. And she had communications with a Sedgwick representative. There's handwritten notes that show, like, actually discussing about specific conditions he had, which included stress and anxiety. And when you look at that handwritten document, like, it almost looks like it's highlighted when she's writing stress and anxiety. There's names of the doctors. So she's having detailed conversations with the Sedgwick representative along with the dates of the requests. And then what happens is when Carr returns to work in September, right before he returns to work, September 6, 2016, he requests FMLA leave, intermittent FMLA leave. And Ruben receives an email from an individual at Sedgwick saying, hey, just a heads up, he's making another request for a disability form. And so a juror could believe that because of how detailed these conversations were with the Sedgwick person, that that included talking about intermittent FMLA leave in September, especially when this is going to be an intermittent leave, it's not going to be an extended leave. So the plant would need to know, hey, he's going to be in and out of this place. Was that the basis of the district court's or was the district court's earliest decision that the claim, the disability claim should survive summary judgment? Was that the basis of it or was it broader than that? It was based on, I guess, everything that came up in May and then also being confirmed from the information that she learned after May while he was out on leave. And what's important here is the court permitted FCA to then reframe the argument on the motion to reconsider, saying that it was actually Ritchie who was the decision maker, which was not raised in their summary judgment motion. So that's when we brought up Katz-Poth theory of liability, which would impute the knowledge from Ruben to Ritchie. And the district court's decision almost seems to agree with us that Katz-Poth would work here because Ritchie did no independent investigation, didn't interview anybody, just rubber stamped Ruben's decision. There doesn't seem to be much of an argument from FCA on that either. So if Katz-Poth applies, we should have survived summary judgment on the disability claim. But who, what is, I'm a little bit confused. What are the party's relative positions on who the decision maker is in this case? Sure, so I mean our argument, I mean our position in the beginning was that Ruben was the decision maker. So in the summary judgment motion, Ruben is the labor supervisor, like over the plant where Karl worked. And Ritchie is the corporate labor supervisor. And in the summary judgment motion in the disability section, it's only discussed as to Ruben's knowledge. So that's how we framed our argument, only to Ruben's knowledge. And then what's kind of discussed in their brief is that Ritchie is there because our client was a union rep. And so when you're firing a union rep, you need to let the international union know, hey, we're going to fire the union rep. And so the way they worded it in the summary judgment motion was that he's there as like a courtesy to let the international union know. And the strongest language they used was to concur with Ruben's. Let me go back to the original question then. So Ruben, if Ruben is the decision maker, why is anything after May relevant? And you're saying because in July when she finds out that he has sought treatment or whatever, she could have dialed back whatever the original recommendation to fire him was, which would have been consistent with the way others were treated. What though, it's still to me, the decision is still made in May. I mean, the causation analysis, the disability, perceived disability analysis, doesn't that have to be measured if she's the decision maker with what the state of affairs was in May before we would get to comparators, which would go to pretext, right? I guess I'm in prima facie land here still. So because he's asking, I need to go on a stress leave, and then he immediately goes on a stress leave. So it's not just saying, I need to do this. I mean, you're not saying it was like an FMLA leave request, are you? I was just saying, oh, maybe I need to take some time off or something. I have a really stressful job. I mean, if somebody says that to me, like some associate at a law firm, I'd be like, okay, take a vacation maybe, I don't know. I'm not thinking, oh, you're disabled. I mean, I just have trouble kind of thinking of that as a disability. Well, so the whole point of the stress leave, it's under this disability leave policy that they have. That's not the FMLA though, right? That's just a separate type of leave? Right. The first one is under their own disability leave. But it isn't a vacation at that point. It's I need to get a doctor to say you're going to be out for this period of time. But does he say that to her? In the interview, does he say, I have a really stressful job. I need to see a doctor. I need to get some help. I need to get these anger issues under control. It's a real problem for me. You know, I'm sorry about what happened the other night. You know, whatever. I mean, I don't see anything other than I have a really stressful job. I think I need to take some time off or take some leave or however he phrases it. Right. So that's how he's phrasing it. I have a stressful job. I'm having a stressful time. I need to see treatment for this.  Well, I understand the argument. Thank you. Do you have a particular case that you think is most supportive of your position on the discrimination claim? Well, I think BAB, the Sixth Circuit decision in BAB, is probably the most preferential for ours where it just has to be perceived to be mentally limited. So we don't have to show substantial limits. Okay. Thank you. I'll reserve the rest of my time. Good afternoon, Your Honors. May it please the Court. My name is Elizabeth Bullduck, appearing on behalf of Appellee, FCA, US, LLC. This case is an effort by appellant to use speculation, conjecture, distractions, and confusion to manufacture a question of fact where there is none. The District Court probably found that there were no genuine issues of material fact, that FCA terminated appellant's employment for violating its standard of conduct policy. The Court didn't find that the first time around, did it? Your Honor, you are correct. The first time around, the Court found that there was a genuine issue of material fact with regards to whether or not FCA perceived appellant to be disabled. They found that solely based on evidence of Ruben's conversation with Sedgwick in July of 2017 or 2016. But to Your Honor's point, that conversation does not matter because the decision had already been made to terminate appellant when that conversation happened. Wasn't the real dispute there at the beginning, both you and your opposing counsel agreed that Ruben was the decision maker, right? I believe, yes, that Ruben was the one who initially made the decision because appellant was a member of union leadership, it required some additional measures and that also required running it by multiple other individuals at FCA to get approval. But basically the understanding was, and based on Ruben's deposition, she testified that she made termination decisions, she made them regularly, she made them in this case, I don't see how she could have been any clearer that this was her decision. And I think that's a great point, is that she recommended, she did the investigation, she recommended it was adopted by others. That decision was documented on May 26, 2016. Appellant only mentioned that he was stressed out about his job and considering taking some sort of stress leave that the union representative can talk to and is under the collective bargaining agreement. I mean, nowhere in this conversation, or even in... So she's the decision maker, so where did the idea that Richie was the decision maker come from? I believe... Did you argue that? Yeah, thank you, your honor. I believe that came up through a briefing situation. I think the district court initially made the decision that Ruben and Richie were decision makers. But I thought you guys thought it was Ruben, and then you planted the idea that it was Richie. I don't believe that's the case. I believe we've laid out the facts that Ruben made the decision, she... And the district court did? Yeah, that's my understanding. My understanding of the briefing, I'm sorry, is that you originally conceded in all the briefings that Ruben was the decision maker. And then the court dismissed one claim in the case and kept the discrimination claim in. And in that FMLA claim, the court indicated that Richie was the decision maker. And then your pleading that came back to request reconsideration argued throughout that Richie was the decision maker. Isn't that the order of things? Your honor, I think we were arguing it in both case scenario, that Ruben was the initial person who made the recommendation, and that that recommendation was reviewed and adapted by Richie. Although Richie said that he accepted what Ruben had said, right? That is correct, that is the testimony. Then don't we have the problem with Richie testifying that where it's severe, which is how this one was portrayed, because they did not go through additional steps, it went right to recommending termination. But isn't there a dispute between the two representatives of FCA, with Richie saying that, well, in severe cases we'd skip, but this was not a severe case. So we just, we let him go on and let him get his treatment and let him come back. I mean, is it, my struggle is that if the position is that it's severe enough that he needed to be terminated immediately, then how can Richie say, how can we not listen to Richie saying it was not that severe? He didn't have to be terminated immediately, we could take our time. Your honor, that is where the district court initially went wrong in its initial order. It relied on or misunderstood the testimony of Richie. I would like to point the court to page 594 where this is addressed. Richie's testimony is clear. That the decision to terminate Appellant was made before he took leave. Counsel for Appellant asked... The recommendation, right? The decision, if you look on page 51 of the transcript on page ID 94, that the recommendation had already been reviewed in the outcome of the case prior to him going out. He then explains that yes, in some circumstances we will move straight to termination even though an employee has requested its sickness and accident leave. But that is reserved for cases where weapons are used, knifes are used, actual physical violence. This is a situation that violated the standards of conduct when he threw his cell phone at his colleague and it hit the door and making a thud. And so there's no dispute that he admits to engaging in this conduct. That Richie found, and so did Ruben, that this conduct violates its code of conduct. Because he was on contractual leave under the collective bargaining agreement, the company allowed him to take his leave. And it was planned to and ready to implement the termination notice when he returned. Did Ruben testify about other incidents or other people or possible comparators? So the testimony that Ruben talks about and comparator actually distinguishes why they're not proper comparators. First and foremost, a pallet tries to compare himself to Emil, who is a supervisor, under a totally different standard. The other five employees who he tries to compare... But do you get more leeway if you're a supervisor? No, they just have a different, I mean, I would say that they have a stricter, right? They have a stricter expectation of FCA requires of them. But the supervisor was allowed to stay. No, he was terminated. And then? There were the others, and that's the point. They were all terminated. And then they grieved it just like he grieved it, and then that was put on hold. But anybody who grieved it in that group of six was put back to work. And here, that is the case too. He did grieve his termination after the negotiation with the union. And then FCA allowed him or provided him an offer of reinstatement. Now, that is not in the record nor the briefing because that occurred after all of this was submitted to the court. That's outside the record. With regards to his FMLA claim, there is no dispute that anyone at FCA considered his request for potentially to take a stress leave under its policies to constitute as an FMLA request. Appellant even testified that his FMLA request was completely separate from leave under the SNA program. So the very first time that Appellant took leave under the FMLA would be September 6th of 2016. There is no record evidence, and Appellant even admits, that he never informed anyone at FCA about his FMLA request. So with regards to his FMLA claim, the court properly dismissed summary judgment on that. I also finally want to talk a little bit about FCA's honest belief. FCA has set forth a legitimate business reason of terminating Appellant. That he violated the standard of conduct, and Rubin conducted an investigation where she talked to 8 separate witnesses. All of those witnesses confirmed that the room was tense, that Appellant threw his cell phone at Isaac, and that others were ready to intervene if Mr. Carr's conduct would further escalate. Rubin, based on her investigation, made the decision to terminate Appellant. Appellant has not shown or put forth any evidence whatsoever that this was not an honest belief. I want to address a few of the reasons why the district court went wrong, because we were already talking about it. I want to stress to the court that being disruptive and throwing objects is far different than using weapons and threatening manners. At all times, FCA intended to terminate Appellant. It never, ever quavered in its decision. There is no record evidence that it altered, changed, or had other discussions regarding whether or not to terminate Appellant. The sole question was when it would implement his termination. On May 25th, after Rubin conducted the investigation, she summarized her notes on May 26th, in which she recommended that termination be implemented. After it went through its proper channels on May 27th, the company decided to terminate him. When you say after the proper channels, you're saying the final decision in September? No. You're saying the final decision was made by everybody that needed to make it on May 27th? That's right. The record is clear that it made its way through the proper channels. Why wasn't he terminated? Why did it take three months or whatever? Pursuant to FCA's policy, because Appellant was a union representative, they had to first notify the international union that they were going to terminate someone in leadership. In May, when the decision had been made, they were planning to notify the international rep. However, that takes some time. It's not like they can just phone call or drop everything to call the international rep. I don't understand that answer. They've got somebody they've got to call and give him this information. Your position is it was not unusual or a different procedure for them to decide on termination on May 27th and to do nothing about it, even though Mr. Ritchie testified that we terminate people while they're on leave, and then you do not terminate him until September 28th. Was that not what gave pause to the district court below? Yes, but that is not accurate. The decision was made in May of 2016. They intended to notify the international rep, but before they could, Appellant requested sickness and accident leave on June 1st and took it. The testimony of Ritchie is that they do not interfere with contractual rights to take that leave. They only do that in extreme situations. It is only reserved to rare situations where there is weapons, actual violence, knives. I mean, here it can be clearly distinguished that throwing a cell phone is definitely improper and violated its standards of conduct, but in no way was... the same when you're going to skip the steps. And isn't that what Ritchie testified? That in severe cases, presumably the kinds of cases that are right here, you skip the three steps of discipline and go straight to firing. And that's exactly what you're saying they did. But then Ritchie testified, no, that we didn't have to do... it was severe enough that we skipped all the steps, but not severe enough to fire him then. I think that was what bothered the district court and it's what bothers me. I don't understand why if your reasoning is that you have to let the international know. You call the international, you write them a letter, three days go by, you're done. But this is a May to September 28. So in this situation, your honor, the three days couldn't go by because he requested a stay leave. But counselor, the problem is Ritchie testified that when you have a severe case that skips three steps of discipline and goes straight to firing, FCA will terminate that employee while that employee is on leave. I believe it's reserved to extreme circumstances of violence where weapons are used would be more accurate. I understand it's not optimal. I could agree with the court on that. It's not ideal. I think your time is up now. Why don't you give us a concluding sentence and we'll let your opposing counsel respond. Thank you. Case law in this circuit is very clear that an employer's business judgment does not have to be optimal. It doesn't have to leave no stone unturned. We would ask here that the court respectfully affirm the district court's decision granting summary judgment and defer to FCA's disciplinary judgment because as an employer, it retains the sole discretion to set and enforce a standard of conduct for all of its employees to abide as a condition of employment. Thank you for your time. Thank you, Your Honors. To go directly into the pretext discussion, the court did not overturn its decision as to pretext after it granted FCA's motion to reconsider. So there was no discussion on the pretext and we're still upheld on that. And when the court ruled on pretext, it ruled that we met it as to sufficiency. And so there are three different ways to meet pretext. Either no basis in fact, did not motivate, or sufficiency. And the honest belief rule comes in when you're arguing for the no basis in fact. And so the honest belief rule doesn't come into this discussion because it was to sufficiency. It wasn't to no basis in fact. But regardless of that, we did provide evidence even for the no basis in fact, which is when you look at the executive summary that was just discussed and the witnesses, virtually none of the witnesses thought he was intimidating. They thought he was being childish, thought he was causing a scene. There wasn't really even evidence from witnesses other than from Ms. Isaac to say that he even threw the phone at her. It said the phone went to a door. It didn't go to her. Most of the witnesses said that she wasn't threatened. And in fact, their own security guard who showed up gave a statement that said that Ms. Isaac told Carr, you can stay in the room if you want. You're not going to tell someone to stay in the room with you if you're threatened by them. If you thought that what they were doing was threatening or harassing or you were scared, you're not going to say, stay in the room, that's fine. And FCA's counselor just brought up, one of the people said, we were ready to deal with him. So they were ready to step in and physically deal with our client. So our client was not being seen as threatening. So there was also no basis in fact which would have beaten. So why did they investigate it? If everybody agreed that nothing happened, why did anybody do any investigation? I mean, Isaac thought it was serious enough to warrant that, right? Right, that kind of gets to our point. They're coming after him to try to fire him. And so they're trying to round up something. They're trying to fire him because they don't like him or because they think he's disabled. The question is, maybe they are targeting him, I don't know. Is it because they think he's disabled? That's the part that I'm struggling with. Maybe they don't like him for any of a number of reasons. But is it because they think he's disabled? Like he has a mental impairment? Like this guy can't be here anymore because he has a mental impairment and we're going to get rid of him. And I'm just, I don't know where that comes from other than him telling her in the interview that he, because you're saying, well, he didn't really do anything at the, you couldn't perceive that he was disabled based on his conduct at the event because it wasn't that bad. This isn't the kind of guy that has an anger issue or a stress issue. He's just throwing his cell phone, okay? Then, so then we just go to the interview and the interview is, what's going on? I have a stressful job. And then she says, oh, you must be disabled, you're out. I mean, that's the story, right? That we have to, that you're, that you're trying to tell us that should go to the jury? Right, that they're basing it off of his known anger issues and flare-ups and that they're treating him differently by saying, you can't even handle anger management because you're too disabled. You're just going to be fired. And then, I mean, during the meeting he also brought up that not only was he stressed, he was having trouble sleeping. And again, with going out on the leave, you're going to need to get a medical provider to substantiate that, to get that leave. So it's not just like, I'm going on vacation. I'm getting this leave approved from a doctor. The district court also discussed, like, Ritchie's moving testimony. So Ritchie, trying to change it up, as FCA was bringing up, that this could be disbelieved by a jury that he was moving his testimony around. All of the individuals, the similarly situated individuals, all have to follow the same SOC conduct. So, like, the same, they're all being applied to the same discipline policy. And so that's how they're also similarly situated. They're going through the same discipline policy, same HR team. So they were similarly situated, and our client's being treated differently. There was no offer of reinstatement at any time during the relevant period. I think if that was brought up, it was for a settlement communication that shouldn't be addressed by the court. And if FCA has now changed the argument once again, that it's actually the decision that's after May, like anything that's a decision after May 27, 2016, then there was no reason for the motion to reconsider in the first place. That was all soundly ruled on by the district court in the initial ruling, that we had met enough information at that point to survive the summary judgment on the disability claim. And then the motion to reconsider was as to Richie's knowledge. Has this case gone through our mediation department at the court? Yes, it did. There was a complete mediation effort? Or is there a possibility that you might consider going back and working with the mediation department and seeing if this case can be resolved? I guess we'd leave that open to FCA, but we were on pretty far spectrums still at the mediation. And did you meet in face-to-face? No, it was over Zoom. Okay. Well, this may be a case that you all might want to consider the possibility of resolving through mediation also. We would commend that to you. I think your time is up. Thank you, Your Honors. We appreciate it. We thank you both for your writing and your arguing, and your case will be taken under advisement, and you will be notified of an opinion in due course. And in the interim, you might consider meeting with the mediation department again and see if you can yourselves format a resolution to this case that would be acceptable to both parties. Thank you.